Argued May 22; affirmed July 1, 1941

## STANCLIFFE *v.* CORN

(114 P. (2d) 1014)

Before KELLY, Chief Justice, and BAILEY, LUSK, RAND and ROSSMAN, Associate Justices.

*Porter J. Neff*, of Medford (Neff & Frohnmayer, of Medford, on the brief), for appellant.

*William M. McAllister*, of Medford (Roberts & McAllister, of Medford, on the brief), for respondent.

LUSK, J. Plaintiff, Bert Stancliffe, is engaged in the business of packing fruit at Phoenix, Jackson county, Oregon. Defendant, E. C. Corn, is a grower of fruit in that vicinity. Plaintiff brought this action to recover the sum of $889.20, with interest, as the agreed price at forty-five cents per box, for packing, at defendant's special instance and request, 1,976 boxes of D'Anjou pears. Plaintiff recovered a verdict and judgment, and the principal question in this appeal is whether the plaintiff made out a case sufficient to submit to the jury.

It is the defendant's theory that the uncontradicted evidence shows that there was never a contract between him and the plaintiff for packing pears and that the only agreement disclosed by the evidence is one for the sale of pears by the defendant to the plaintiff, which the plaintiff breached; and error is therefore assigned upon the court's denial of defendant's motions for non-suit and a directed verdict.

The record shows that on Sunday, August 20, 1939, plaintiff received the following telegram from Duck-

wall Brothers, Inc., a brokerage firm at Hood River, Oregon:

"MR. BERT STANCLIFFE
INDEPENDENT PACKING CO
PHOENIX ORG.

"OFFER 1.35 EXTRAS 1.15 FANCIES NET FOB CARS MEDFORD TEN MEDFORD ANJOUS 10093 LIMIT 10% HUNDRED TENS SHIPMENT STRAIGHT CARS 640 BOXES EACH EXTRAS AND FANCIES WHEN READY TO PORTLAND PAYMENT HALF TIME SHIPMENT BALANCE THIRTY DAYS INSPECTION FOR FRENCH CERTIFICATES TIME SHIPMENT WITHOUT GUARANTEE FROM YOU HOWEVER CARS PASS FRENCH INSPECTION EXCEPT DONT WANT ANJOUS FROM ORCHARDS WHERE YOU KNOW SCALE PRESENT HOLD THIS OFFER OPEN TILL TUESDAY ADVISE SOON POSSIBLE

"DUCKWALL BROS INC."

Either on Sunday evening or the next morning plaintiff saw defendant at his orchard, which is some two miles distant from plaintiff's packing plant, and showed him the telegram and the two discussed the terms of a sale of Corn's pears. Corn was then engaged in picking his fruit, had enough pears for seven cars, and said that he was holding for a price of 90 cents a box for extras and 70 cents a box for extra fancies. Stancliffe told Corn that his price for packing would be 55 cents a box, which, of course, he would be unable to get if Corn was to realize 70 cents and 90 cents, respectively, out of the sale price of $1.15 and $1.35, and Stancliffe suggested that he might be able to induce Duckwall Brothers, Inc., to raise its offer five

cents a box while he, Stancliffe, would reduce his packing charge to 50 cents a box. We quote from plaintiff's testimony:

"Q. Well then go ahead and tell what was done. Did you show Mr. Corn the telegram?

"A. Yes.

"Q. And what was the result then?

"A. Well, Mr. Corn said that he wanted seventy and ninety so I explained to him that if it was possible I would get Duckwall Brothers to raise a nickel and I would also pack for five cents less which would give him ten cents a box more, and that was very favorable to him and he said, of course, the payments there is half down and the balance in thirty days. He said he knew Duckwall Brothers and that was okeh.

"Q. Well, did you at any time during that conversation offer to buy these pears or indicate that you were going to buy them?

"A. No, no sir. I told him he was dealing with Duckwall Brothers and he knew it.

"Q. What was the purpose in showing the telegram to him?

"A. To show who was buying them. I didn't think otherwise I would be able to secure the fruit.

"Q. Did you have any money with which to buy pears?

"A. No, I didn't.

"Q. And—well, then you said you would try to get Duckwall Bros. to raise the price a nickel and you would cut your packing price and get Corn his seventy and ninety?

"A. Yes sir.

"Q. What else was said, if anything? Was anything said after that when you saw him again?

"A. Well, yes, he wanted to know right away. He was already picking and hauling down there.

"Q. Down where?

"A. In Medford, and he said if I could get that order that would give him seventy and ninety he would take it, so I ---

"Q. When were you to let him know?

"A. Well, he wanted me to let him know by ten o'clock next day, I believe."

Following this the plaintiff telephoned to Duckwall Brothers, Inc., " * * * and I told him if he could raise that a nickel I would reduce the packing a nickel . and we could buy approximately seven cars of Anjou pears from Mr. Corn, a large block, and Duckwall wanted to know if I could furnish ten additional cars at the same price. When I was talking to him, I told him we were filling the first ten cars at one fifteen and one thirty-five."

Plaintiff testified that he had seen other growers who were anxious to sell at $1.15 and $1.35, and whom he intended to charge fifty-five cents a box for packing. At the conclusion of the telephone conversation Duckwall said that he would cable out regarding the additional nickel.

Stancliffe then, after consulting with his foreman and his bookkeeper, decided not to wait until he should hear from Duckwall as this would compel him to lay off his crew and perhaps to lose them, but that he would apply the seven cars of fruit which Corn had available on the telegraphic order for the ten cars which he had accepted, and would make his charge for packing 45 cents a box. The next morning, at Stancliffe's direction, his foreman, Cline, went to Corn's orchard and notified him to bring his pears in, and Corn thereupon commenced delivering pears to Stancliffe's packing house. By the end of the third day thereafter the plaintiff had packed and loaded three cars of the defendant's pears. On the evening of the second day Duckwall phoned to Stancliffe that he would not accept the pears, saying that he had under-

stood that when Stancliffe asked for an additional nickel the original order for ten cars was automatically cancelled.

The next morning Stancliffe tried unsuccessfully to reach Corn by telephone. The pears were in the cars on the tracks without refrigeration, and it was necessary to dispose of them to prevent deterioration, and finally, after some inquiries, the plaintiff arranged with a representative of the Pacific Fruit and Produce Company to secure storage with the Northwestern Ice & Cold Storage Company in Portland, and accordingly the three cars were shipped to Portland and the pears placed in cold storage in that company's warehouse. The pears were received by the railroad company for shipment on Friday, August 25, and it was not until the following Sunday that Stancliffe informed Corn that Duckwall had refused to take his pears. In the meantime Corn had discontinued delivery of pears to the plaintiff for the reason, as he testified, that he had found Stancliffe's packing house so congested with loose fruit that he was unable to take care of it, and had learned from Stancliffe that the latter had been unable to find out from Duckwall Brothers, Inc., where the fruit was to be shipped, and he feared that the fruit which was piling up in his orchard would deteriorate.

The three carloads shipped to Portland, together with 56 additional boxes delivered in Medford by the plaintiff at the defendant's direction, comprise 1,976 boxes of pears, for packing which this action was brought.

■ In substance, the defendant testified that he agreed to sell seven cars of pears, not to Duckwall Brothers, Inc., but to the plaintiff, at a price of 70 cents

for fancy pears and 90 cents for extra fancy pears. There is no need to go into the details of his testimony, since we are concerned, not with the weight of the evidence but solely with the question whether there is any competent, substantial evidence to support the judgment. Were the defendant's version of the transaction found to be true, it would preclude the idea of an agreement on his part to pay plaintiff for packing the fruit. But a jury, accepting plaintiff's version, would have been warranted in concluding that the minds of the parties met on the agreement alleged in the complaint.

■ From the plaintiff's standpoint the case presented was that of a packer who was seeking business by bringing to the attention of growers an offer from a firm of brokers for the purchase of fruit and giving the growers an opportunity to dispose of their fruit by acceptance of the offer. The plaintiff acted as intermediary, the means of communication between the contracting parties. His interest was to get the job of packing the fruit sold. He was not engaged in the business of buying and selling fruit. The telegram from Duckwall Brothers, Inc., was not, as the defendant contends, an offer for acceptance by the plaintiff alone. Duckwall Brothers, Inc., was not entering into a contract for personal services, and it could make no difference to that firm who might fill the order. It was interested only in obtaining the quantity of pears, of the grades, at the prices, and on the terms stated in the telegram, and there is ample evidence that such was the understanding of the defendant as well as the plaintiff. Giving the plaintiff's evidence the benefit of every reasonable inference, he and the defendant agreed that if the plaintiff would conclude a contract with Duckwall Brothers, Inc., for the sale of the de-

fendant's pears, under which the defendant would receive 70 cents a box for extras and 90 cents for extra fancies, plaintiff would have the job of packing, and his compensation would amount to the difference between the selling price agreed on and the minimum set by the defendant. The defendant himself partially corroborated this view when he testified that he said to the plaintiff:

"At ten o'clock tomorrow, if you can get me or if you can give me seventy and ninety, I will stop the American Fruitgrowers (with whom he had a packing contract) and have the fruit up to your packing house tomorrow."

The plaintiff accepted the offer of the brokers as made, decided to fill it to the extent of seven cars with the defendant's fruit, and to meet the defendant's price by reducing his packing charge from 55 cents to 45 cents a box. When the defendant, at plaintiff's request, commenced delivery of the fruit, that act consummated the agreement for packing the fruit. It is true that the plaintiff did not advise the defendant that he was reducing his packing charge to 45 cents, but that, it might be said, was not of the essence of the transaction; it was all one to the defendant what the charge would be as long as he received the price which he demanded. This he would have got had Duckwall Brothers, Inc., carried out the agreement which the plaintiff, in good faith, made with that firm on behalf of the defendant. That, we think, is the view which a jury, weighing conflicting evidence and competing inferences, would have been warranted in taking. Obviously, therefore, the question was not one of law for the court but of fact for the jury, to determine whether the minds of the parties met in a common

agreement, and, if so, what the terms of that agreement were. 17 C. J. S. 1270, § 611.

The court below therefore did not err in denying defendant's motions for a nonsuit and directed verdict.

■ A number of assignments of error based on the court's refusal to give instructions requested by the defendant in effect raise the same questions as those involved in these motions and require no discussion. The defendant assigns as error the giving of the following instruction:

"The defendant, on the other hand, Mr. Corn, has asserted that he sold his pears to Mr. Stancliffe and that Mr. Stancliffe is responsible for packing his own pears under the arrangement. Now, in order that Mr. Corn may prevail in his contention, he must establish that by a preponderance of evidence.

"If either party fails to establish his own contention by a preponderance of all the evidence that is introduced in the case, then he fails in that contention."

The defendant, in his answer, did not content himself with denials of the allegations of the complaint, but, by separate answer, alleged that he sold the pears in question to the plaintiff and set forth the terms of the sale. It may be assumed that he need not have done so, that he could have proved the facts alleged by him under his general denial, and that he was not charged with the burden of establishing the defense thus pleaded. It is evident, however, that counsel for defendant was of the contrary opinion until he was noting his exceptions to the court's instructions, because not only did he take the course in his pleadings which we have outlined but by two requested instructions he advised the court that, in his view, he had the

burden of proving a sale to the plaintiff. The defendant's requested instruction Number II reads as follows:

"I instruct you that if you find, by a preponderance of the evidence, that the plaintiff agreed to purchase from defendant and the defendant agreed to sell to plaintiff 7 cars of pears as alleged in defendant's answer, then your verdict must be for the defendant."

His requested instruction Number V is in part as follows:

"If you find, by a preponderance of the evidence, that the plaintiff agreed to purchase from the defendant and the defendant agreed to sell to the plaintiff 7 cars of pears as alleged in the defendant's answer * * * *"

In view of this record the error, if any, in giving the instruction complained of was clearly invited and cannot, on appeal, be assailed as ground of reversal. *Caldwell Banking & Trust Co. v. Porter*, 52 Or. 318, 331, 95 P. 1, 97 P. 541; *State v. Ryan*, 56 Or. 524, 531, 108 P. 1009; *Seaside v. Oregon Surety & Casualty Co.*, 87 Or. 624, 633, 171 P. 396.

A question arises under a counter-claim filed by the defendant. It was alleged in this pleading that by reason of the wrongful act of the plaintiff in shipping the three cars of pears to Portland without defendant's knowledge or consent the defendant incurred an expense of $50 in regaining possession of his pears and was required to pay Northwestern Ice & Cold Storage Company $600.90 for storage, freight and demurrage. The uncontradicted evidence shows that the three cars were shipped under a "storage in transit" tariff, that the charges were paid by the defendant in September, 1939, when he recovered his fruit; that he sold the fruit in New York, and his freight charges

for shipment as from Medford to New York were reduced by the full amount of the "storage in transit" charge less $80; and that he paid out $25 for legal assistance in recovering the three cars of pears. The trial court instructed the jury that the defendant was entitled to recover these items of $80 and $25, and their allowance is reflected in the plaintiff's judgment. But the defendant contends that he is entitled to recover from the plaintiff the full sum of $600.90, notwithstanding that in legal effect, and actually, he has already been reimbursed in the entire amount save $80. We think the mere statement of the contention demonstrates its want of merit.

We find no reversible error, and the judgment is therefore affirmed.