Berle MERCER, Appellant,

v.

YUTAN CONSTRUCTION COMPANY,
Appellee.

No. 631.

Supreme Court of Alaska.

Nov. 17, 1966.

Warren A. Taylor, Fairbanks, for appellant.

Charles J. Clasby, Collins & Clasby, Fairbanks, for appellee.

Before NESBETT, C. J., DIMOND, J., and GILBERT, Judge.

## OPINION

NESBETT, Chief Justice.

In this decision we are required to determine whether appellant's rights as lessee under a grazing permit from the United States were infringed by the manner of the construction by the State of Alaska of a pioneer access road across a portion of the leased land.

At the time this litigation was commenced appellant was in possession of approximately 95,000 acres of public land located near Lignite, Alaska which had been leased to him by the Secretary of the Interior for grazing purposes. Located on the land was a natural hay meadow from which appellant had annually, since becoming a lessee in 1957, harvested hay for winter cattle feed. The Stampede Winter Trail, a sled trail connecting Lignite, on the Alaska Railroad, with the Stampede Mine located some 65 miles distant, passed across a portion of appellant's grazing lands close to but somewhat uphill from the natural hay meadow.

In 1960 the State of Alaska contracted with appellee, Yutan Construction Company, for the construction of a pioneer access road from Lignite to Stampede Mine. Under the Access Roads Act[1] the state could contract for the construction of low standard, low cost roads into areas rich in natural resources as the first step in opening the area for development. The roads thus constructed were not required by the act to be passable throughout the year and were not to be maintained by the state. Under the contract herein appellee was permitted to deviate up to one mile from the tentative road route.

Appellee followed along the approximate route of the Stampede Winter Trail as it attempted to construct the access road past the natural hay meadow, but was forced to abandon the partially constructed road in that particular area because of an unanticipated excess of muskeg and scarcity of gravel. The access road was then rerouted to pass to the north of the abandoned roadway and farther away from the hay meadow than would have been the case had it not been necessary to alter the route.

In his complaint appellant named the State of Alaska and appellee Yutan Construction Company as defendants, alleging that they had entered upon a specifically described portion of the land without his consent and diverted waters on the higher ground from natural drainage channels causing them to flood appellant's meadow lands. It was then alleged that because of flooding, about 60 acres of the 120 acre meadow could not be harvested resulting in a loss to appellant of 100 tons of hay in 1961 of the reasonable value of $140.00 a ton delivered at Lignite, Alaska.

During the trial appellant and appellee Yutan stipulated that the action should be dismissed with prejudice with respect to the State of Alaska because appellant had no claim against the state and it was so ordered.

The suit was defended on the ground that the land use of a grazing permit was subordinate of rights-of-way for public roads.

As to this defense appellee relied upon an Act of Congress of March 4, 1927,[2] the policy of which is stated to be the protection, development, and utilization of the public lands in Alaska by establishing an adequate system for grazing thereon. Appellee relied specifically upon sections 3(a) and 16 of this act. Section 3(a) states in part:

The Secretary may establish grazing districts upon any *public lands* * * *. (emphasis appellee's)

Section 16 states:

Laws now applicable to lands or resources in the Territory of Alaska shall continue in force and effect to the same extent and in the same manner after the enactment of this Act as before, and nothing in this Act shall preclude or

---

1. AS 19.30.010–19.30.100.

2. 44 Stat. 1452 (1927).

prevent ingress or egress upon the lands in districts for any purpose authorized by any such law, including prospecting for and extraction of minerals.

Appellee also relied upon the general grant by the United States of a right to cross public lands of the United States contained in 43 U.S.C. section 932.[3] This section states that:

> The right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted.

and lastly, reliance was placed upon section 4(f) of appellant's grazing lease which states in part that:

> Nothing herein shall restrict the acquisition, granting, or use of permits or rights-of-way under applicable law.

and upon the pioneer Access Roads Act.

The above defense, in summary, being that the lands under lease to appellant were public lands, not reserved for public use; that the state's contract with Yutan under the Access Roads Act was a valid acceptance of a grant and exercise of a right-of-way over appellant's grazing land and that appellant's lease specifically subordinated grazing rights to the use of the right-of-way thus claimed and exercised.

Appellant's answer to this defense was that the land involved was not "public land" as defined by this court in its decision in Hamerly v. Denton.[4] Under *Hamerly,* appellant argued, public lands are defined as lands which are open to settlement or other disposition under the land laws of the United States and do not include lands in which the rights of the public have been passed and which have become subject to the individual rights of a settler. Appellant conceded that *Hamerly* was discussing the

rights of a homesteader, but argued that there is no distinction between the rights of a homesteader before patent issues and appellant who occupied the land under an express permit. Appellant now claims that the above argument is buttressed by section 6(a) of the Alaska Statehood Act[5] dealing with the right of the state to select vacant, unappropriated, and unreserved public lands of the United States and which states in part:

> Provided. That nothing herein contained shall affect any valid existing claim, location, or entry under the laws of the United States, whether for homestead, mineral, right-of-way, or *other purpose whatsoever,* or shall affect the rights of any such owner, claimant, locator, or entryman *to the full use and enjoyment of the land so occupied. * * ** (emphasis appellant's)

Appellant's reasoning seems to be that the grazing lands herein had become appropriated by reason of the grazing lease and that before the state could exercise a right-of-way over the land it would have to obtain a relinquishment from the federal government of that portion of the grazing lease containing the right-of-way.

The trial court did not discuss the legal aspects of the above defense or appellant's answer thereto and merely stated in its memorandum opinion that:

> Factually, I find that defendant had a right to construct a road over the old Stampede Trail and that it used standard approved road building construction methods and practices in construction.

In its findings of fact however, the court found that the State of Alaska had a right to construct a road over the old Stampede Trail, and that it caused the road to be constructed on the public lands of the

---

3. 14 Stat. 253 (1866), 43 U.S.C. § 932 (1964).

4. 359 P.2d 121, 123 (Alaska 1961).

5. 72 Stat. 340 (1958), 48 U.S.C. § 6(a) (1962).

United States in acceptance of a grant of right-of-way under 43 U.S.C. § 932.[6]

We interpret the trial court's findings on this point as being an approval and application of the legal theory advanced by appellee and we affirm. Any force in appellant's argument is negated by the undisputed fact that his lease rights were subordinated to rights-of-way legally exercised. We do not consider Hamerly v. Denton applicable to these facts. The rights of a homesteader, upon the passage of time and compliance with the requirements of law, ripen into title. Here, as lessee of grazing lands, appellant could never acquire any greater rights in the land. In addition to rights-of-way, appellant's grazing rights were expressly subordinated to the development of mineral, timber, water, agriculture and other resources.[7] The second defense asserted by appellee was that the construction methods employed were standard practices usually employed for similar terrain and not negligent.

Appellant relied in part on AS 19.10.230 which states:

A highway constructed or reconstructed shall be designed to permit water to drain from it into ditches which shall drain into coulees, rivers and lakes according to the surface and terrain where the highway is constructed in accordance with scientific highway construction and engineering in order to prevent the water from overflowing onto adjacent and adjoining lands. The natural flow and drainage of surface water shall not be obstructed, but it shall be permitted to follow the natural course according to the surface and terrain.

arguing that flooding resulting from failure to comply with this section amounts to negligence per se.

After listening to the conflicting testimony of witnesses for both sides the trial court found that appellee had used standard and approved road building methods; that the surface water which was the subject of dispute drained in the same direction that it always had with negligible increase in flow caused by any surface disturbance resulting from appellant's construction; that appellant's acts were not reckless, negligent or ultra-hazardous and that the most probable cause of any water problem experienced in the hay meadow was the increased rainfall during the years in question.

We have reviewed the record and studied the exhibits and find that there is substantial evidence to support the trial court's findings on this point. This being so, we shall be governed by Rule 52(a) of the Rules of Civil Procedure which, in pertinent part states:

Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

The trial court was obviously influenced by the testimony of appellee's hydrographic expert who spent a considerable period of time on the property involved studying the terrain and the effect appellee's particular construction efforts had on the drainage characteristics. This testimony directly contradicted that of appellant and his witnesses in many important respects. We find no error connected with the trial court's determination of the conflict in the evidence.[8]

We do not believe that AS 19.10.230, which by its terms applies to the construction of highways, applies to the construction of pioneer access roads. As appellee aptly points out, the legislature distinguished

6. 14 Stat. 253 (1866), 43 U.S.C. § 932 (1964). This statute is quoted in the text at note 3 supra.

7. See 43 C.F.R. § 4131.2-7(e) (1964).

8. This court will not set aside findings of fact unless they are clearly erroneous. City of Fairbanks v. Schaible, 375 P.2d 201, 209 (Alaska 1962); Nordin v. Zimmer, 373 P.2d 738, 742 (Alaska 1962).

pioneer access roads from highways, saying in AS 19.30.020 that:

These pioneering access roads are envisaged as being essentially low standard, rudimentary truck roads, not usually fit for passenger automobile use and not necesarily subject to repair, upkeep, or seasonal maintenance.

and in AS 19.30.040 as to standards that the Department of Highways shall:

* * * (2) use the cheapest methods of construction consistent with the purpose of * * * this chapter; (3) construct low standard roads which need not necessarily be suitable for all weather use * * *.

The third defense was that appellant had suffered no damage.

The trial court's Finding No. 8 on this point states:

That during each year about which plaintiff complains of loss of hay he actually cut and produced as many tons of hay from his property in relation to animals to be fed, as was produced in prior years. That plaintiff purchased no hay to replace that claimed lost by flooding. That plaintiff claims no right to harvest and sell, or market, hay from this grazing area. That plaintiff suffered no compensable loss by reason of any loss of hay production resulting from any flooding of the hay meadow.

█ The above finding is amply supported by the testimony of appellant alone. Under the terms of the Act of March 4, 1927,[9] and the Taylor Grazing Act [10] grazing permits were limited to grazing and did not include the cultivation and removal of vegetable matter.[11]

The judgment below is affirmed.

9. 44 Stat. 1452 (1927).

10. 48 Stat. 1269, (1934) as amended, 43 U.S.C. § 315 (1964).

11. In 1964, pursuant to the act of March 4, 1927, a regulation was passed which provided that under certain conditions the lessee could sell hay or ensilage from seeded or reseeded areas. See 43 C.F.R. 4131.2–9 (1964). However, during the period in question in this case no such sales of hay or ensilage by the lessee were permitted.